

FILED
2023 Mar-31  PM 02:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **JACOB DANIEL WINKLER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO.:  4:20-cv-01561-MHH** |
| | } | |
| **KILOLO KIJAKAZI,** | } | |
| **ACTING COMMISSIONER OF** | } | |
| **SOCIAL SECURITY,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Jacob Daniel Winkler seeks judicial review of a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  The Commissioner denied Mr. Winkler's application for disability insurance benefits based on an Administrative Law Judge's finding that Mr. Winkler was not disabled. Mr. Winkler contends that since his onset date, he has suffered from mental health conditions that have prevented him from working.  Mr. Winkler argues that, in assessing his RFC, the ALJ failed to consider his hospitalizations during and between employment, his reasons for leaving his jobs, and the likelihood, frequency, and severity of relapses of his impairment, and the ALJ incorrectly evaluated his subjective complaints about his bipolar disorder symptoms.  (Doc. 15, pp. 13, 15).

The Commissioner asserts that substantial evidence supports the ALJ's RFC finding and the ALJ's evaluation of Mr. Winkler's subjective complaints.  (Doc. 18, pp. 5, 13).  This opinion resolves Mr. Winkler's appeal.

## LEGAL STANDARD FOR DISABILITY

To succeed in his administrative proceedings, Mr. Winkler had to prove that he was disabled.  *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013).  "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months."  *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[1]

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the

---

[1]  Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program.  Title XVI of the Act governs applications for Supplemental Security Income or SSI.  "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited March 8, 2023).

claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

Mr. Winkler applied for disability benefits on August 8, 2018. He alleged that his disability began on June 12, 2018. (Doc. 11-6, pp. 2-6). Mr. Winkler reported that he had been diagnosed with bipolar disorder, and he had been hospitalized eight times in the year preceding his application. (Doc. 11-6, p. 4). The Commissioner initially denied Mr. Winkler's claim, (Doc. 11-5, pp. 2-7), and Mr. Winkler requested a hearing before an ALJ, (Doc. 11-5, pp. 10-14). The ALJ issued an unfavorable decision on December 24, 2019. (Doc. 11-3, pp. 13-27). On December 31, 2019, Mr. Winkler asked the Appeals Council to review the ALJ's decision. (Doc. 11-5, pp. 65-66). The Appeals Council denied Mr. Winkler's request for review, (Doc. 11-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g) and § 1383(c).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

*Mr. Winkler's Medical Records*

To support his application for disability insurance benefits, Mr. Winkler submitted medical records dating to 2017. Mr. Winkler's medical records relate to his diagnosis of and treatment for bipolar disorder and obesity. The Court has reviewed the medical records that appear in the administrative record and summarizes the following medical records because they are the records most relevant to Mr. Winkler's appeal.

On September 13, 2017, Mr. Winkler sought treatment in the emergency room at Gadsden Regional Medical Center. (Doc. 11-8, p. 51). Mr. Winkler reported that he was mentally unstable and was having thoughts of harming himself. He felt that he was a risk to others. His primary care physician had changed his antidepressant from Lexapro to Viibryd, and Mr. Winkler was struggling with the new medication. Mr. Winkler indicated that he had a history of mental illness. (Doc. 11-8, p. 51). Nurse Practitioner Jennifer Firestone evaluated Mr. Winkler. Nurse Firestone noted that Mr. Winkler was anxious and hostile and was having thoughts of suicide and homicide. (Doc. 11-8, p. 52). Nurse Firestone diagnosed Mr. Winkler with anxiety, depression, and psychosis and found that he was at risk for suicide and homicide. (Doc. 11-8, p. 54).

Nurse Firestone sent Mr. Winkler to the CED Mental Health Center. (Doc. 11-8, p. 125). Mr. Winkler reported to therapist Nicole Dumas that he was not having auditory or visual hallucinations, but he was having suicidal and homicidal thoughts and was feeling angry. (Doc. 11-8, p. 135). Ms. Dumas diagnosed Mr. Winkler with Bipolar Disorder II and recommended him for inpatient treatment. (Doc. 11-8, p. 136). At the time, Mr. Winkler was working full-time as a diesel mechanic. (Doc. 11-8, pp. 6, 126, 134).

The following day, Mr. Winkler was admitted to the inpatient psychiatric unit at Decatur Morgan West Hospital for evaluation, treatment, and stabilization. (Doc. 11-8, pp. 6-14). Mr. Winkler reported that he wanted to hurt his wife, kids, and dog; that he had not hurt his kids in the past, but he frequently hit his wife; and that he abused his dog. He reported visual hallucinations that he attributed to Lexapro. He also reported tactile hallucinations and the feeling that people were always behind him. (Doc. 11-8, p. 10). Mr. Winkler had an elevated mood, and he was irritable and unkempt. His thought processes were organized and coherent; he was oriented to person, place, time, and circumstances; and his judgment and insight were poor. (Doc. 11-8, p. 11). Mr. Winkler received intensive psychopharmaceutical treatment and monitoring from September 14, 2017 until September 21, 2017. (Doc. 11-8, p. 12; Doc. 11-10, pp. 3, 8). He was diagnosed with Bipolar I in a mixed severe state with psychotic features. (Doc. 11-8, p. 11). Mr. Winkler received prescriptions for

several psychiatric medications—Depakote for mood stability, Cymbalta for depression, Zyprexa for psychosis and mood stability, and Trazodone for sleep. (Doc. 11-8, p. 7).[2]

On September 22, 2017, Mr. Winkler visited CED for an intake assessment. (Doc. 11-8, p. 124). Mr. Winkler believed that his medications were working, but he had only a 30-day supply with no refills. (Doc. 11-8, p. 124). Mr. Winkler reported that he was sad that he was isolated from his family, but otherwise his depression was a 2/10. (Doc. 11-8, p. 124).

On October 10, 2017, Mr. Winkler sought treatment at the Gadsden Regional ER because he had been experiencing suicidal thoughts for two weeks. (Doc. 11-8,

---

[2] Divalproex, also known by its brand name, Depakote, can be used to treat the manic phase of bipolar disorder (manic-depressive illness). https://www.mayoclinic.org/drugs-supplements/divalproex-sodium-oral-route/side-effects/drg-20072886?p=1 (last visited on March 8, 2023).

Duloxetine, also known by its brand name Cymbalta, belongs to a group of medicines known as selective serotonin and norepinephrine reuptake inhibitors (SSNRIs) and is used to treat depression and anxiety. https://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/description/drg-20067247 (last visited on March 8, 2023).

Olanzapine, also known by its brand name Zyprexa, is in a class of medications called atypical antipsychotics and can be used to treat bipolar disorder. https://medlineplus.gov/druginfo/meds/a601213.html#brand-name-1 (last visited on March 8, 2023).

Trazodone, also known by its brand name Desyrel, is in a class of medications called serotonin modulators and is used to treat depression. https://medlineplus.gov/druginfo/meds/a681038.html#brand-name-1 (last visited on March, 2023).

p. 140). Mr. Winkler reported that he had thoughts of "running his car off of a bridge or pulling out in front of a semi, stabbing himself, or drinking coolant from his job as a diesel mechanic." (Doc. 11-8, p. 140). Mr. Winkler denied hallucinations and reported his bipolar I diagnosis and his medication regimen. (Doc. 11-8, p. 140). In the ER, Dr. Stephen Jones diagnosed Mr. Winkler with suicidal ideations and chronic bipolar I disorder. (Doc. 11-8, p. 144). Dr. Jones found that Mr. Winkler's judgment was impaired. (Doc. 11-8, p. 142).

Later that day, Dr. Benjamin Carr admitted Mr. Winkler to the inpatient care unit at GRMC and increased Mr. Winkler's Cymbalta dosage. (Doc. 11-8, p. 148). Mr. Winkler was discharged on October 13, 2017. (Doc. 11-8, p. 148). At discharge, Mr. Winkler reported a better mood and positive interactions with others in the unit. (Doc. 11-8, p. 148). Dr. Carr noted that Mr. Winkler was calm, cooperative, pleasant, and without agitation. (Doc. 11-8, p. 148).

Mr. Winkler returned to the Gadsden Regional ER on October 22, 2017. (Doc. 11-8, p. 155). His reported that he had had suicidal thoughts for two days and had planned to overdose on his prescription medication. (Doc. 11-8, p. 158). Mr. Winkler transferred to Gadsden Regional's inpatient psychiatry unit. (Doc. 11-8, p. 162). Mr. Winkler attributed his agitated state to his wife "push[ing] his buttons" making his bipolar "act up." (Doc. 11-8, p. 166). Dr. Carr explained to Mr. Winkler that bipolar disorder was comprised of distinct mood episodes and was not simply a

reaction to agitation.  (Doc. 11-8, p. 168).  Dr. Carr increased Mr. Winkler's Zyprexa dosage at night and added a dose at lunch.  Dr. Carr noted that after the medication adjustment, Mr. Winkler "was very pleasant and cooperative, was not having any agitation or combative behaviors on the unit.  He was actually very pleasant, cooperative, and was participating in group and was very engaged in his treatment and ensuring that he had a solid aftercare plan to make sure that he could continue his recovery."  (Doc. 11-8, p. 166).  Mr. Winkler planned to go home with his mother and work with DHR on his relationship with his wife and children.  (Doc. 11-8, p. 166).  Dr. Carr discharged Mr. Winkler on October 27, 2017 in stable condition. (Doc. 11-8, p. 166).

Mr. Winkler had a post-hospitalization appointment at CED on October 31, 2017.  (Doc. 11-8, p. 123).  Mr. Winkler reported no thoughts of suicide, but he was experiencing side effects from his medications.  (Doc. 11-8, p. 123).

During an appointment at CED on November 9, 2017, Mr. Winkler reported that he was doing well, and his medication was helping. (Doc. 11-8, p. 121).  Mr. Winkler reported that he had lost his insurance because he got fired when he was admitted to the hospital in October.  (Doc. 11-8, p. 121).  Mr. Winkler was looking for a job.  (Doc. 11-8, p. 121).  Mr. Winkler's concentration was diminished, and his attention span and judgment were fair.  (Doc. 11-8, p. 122).

During a therapy session at CED on November 10, 2017, Mr. Winkler reported frustration that his parents did not understand what was going on with his mental health; they felt that he should be able to "snap out of it." (Doc. 11-8, p. 120). Mr. Winkler was awaiting a job interview. (Doc. 11-8, p. 120).

Mr. Winkler returned to the Gadsden Regional ER on January 2, 2018. (Doc. 11-8, p. 176). Mr. Winkler reported that he had been having suicidal thoughts for one week; he kept feeling like he wanted to kill himself and "just not wanting to be around." (Doc. 11-8, pp. 176, 187). Mr. Winkler reported visual hallucinations and stated that his medications were not working to stabilize his mood. (Doc. 11-8, p. 187).

Mr. Winkler was admitted to the locked psychiatry unit at Gadsden Regional. (Doc. 11-8, p. 188). While in the unit, Mr. Winkler started and was stabilized on lithium. (Doc. 11-8, p. 188). Mr. Winkler was discharged on January 6, 2018, with instructions to follow-up with his primary care doctor within one to two days. (Doc. 11-8, pp. 173-74). At discharge Mr. Winkler was not suicidal, and he denied auditory and visual hallucinations. Mr. Winkler received prescriptions for trazodone, atorvastatin, and lithium. (Doc. 11-8, p. 188).[3]

---

[3] Lithium is used to treat and prevent episodes of mania in people with bipolar disorder. Lithium is in a class of medications called antimanic agents and works by decreasing abnormal activity in the brain. https://medlineplus.gov/druginfo/meds/a681039.html (last visited on March 8, 2023).

During a therapy session on January 24, 2018, Mr. Winkler reported that he was doing well, and he felt that is medications were effective.  (Doc. 11-8, p. 119). Mr. Winkler reported that he was able to fall asleep easily, and he was working full time.  (Doc. 11-8, p. 119).

One week later, Mr. Winkler returned to CED.  His mood was brighter, and his affect was full range and congruent.  (Doc. 11-8, p. 117).  Mr. Winkler was delivering food to senior citizens.  (Doc. 11-8, p. 117).  The physician who treated Mr. Winkler wrote that Mr. Winkler's concentration was diminished, his attention span was fair, and his insight and judgment were limited.  (Doc. 11-8, p. 118).  Mr. Winkler reported that his recent prescription for lithium helped.  (Doc. 11-8, p. 117). The physician took labs for the lithium treatment.  (Doc. 11-8, p. 118).  Mr. Winkler was living with his parents.  (Doc. 11-8, p. 117).  The physician recommended that Mr. Winkler attend anger management classes and see a therapist for psychotherapy to address concerns and stressors.  (Doc. 11-8, p. 118).

Mr. Winkler had a follow up evaluation at CED on March 29, 2018.  (Doc. 11-8, p. 115).  Mr. Winkler reported that he was not feeling well, and he was having visual hallucinations.  (Doc. 11-8, p. 115).  Mr. Winkler reported that he had stress at home with his parents and that he was going through a divorce.  (Doc. 11-8, p. 115).  Mr. Winkler's thought processes were significant for suicidal ideations, paranoia, and visual hallucinations.  (Doc. 11-8, p. 115).  Mr. Winkler's

concentration was diminished, his attention span was fair, and his insight and judgment were limited.   (Doc. 11-8, p. 24, 116).   The physician addressed prescription options with Mr. Winkler; Mr. Winkler felt that returning to the hospital was his safest option.  (Doc. 11-8, p. 116).

Mr. Winkler was admitted to the inpatient psychiatry unit at Gadsden Regional the same day.  (Doc. 11-8, p. 223).  Dr. Meadors noted that Mr. Winkler had an odd affect and that he smiled when describing his hallucinations, that he spoke quickly, and that his judgment was impaired.  (Doc. 11-8, pp. 225-26).  Dr. Meadors indicated that because of Mr. Winkler's "history of interpersonal conflict," his hallucinations might be "more akin to micropsychotic episodes and reflective of personality disorder."  (Doc. 11-8, p. 226).[4]  Mr. Winkler denied paranoia, but he said he would become nervous when someone else was walking near him.  (Doc. 11-8, p. 225).  Mr. Winkler's suicidal and psychotic symptoms dissipated with medication changes which he tolerated well.  (Doc. 11-8, p. 223).  Mr. Winkler was discharged on April 3, 2018.  (Doc. 11-8, p. 220).  At discharge, Dr. Meadors noted that Mr. Winkler's thoughts were "linear and much more appropriate" than upon admission, and his insight and affect had improved.  (Doc. 11-8, p. 223).  Mr.

---

[4] "Both auditory hallucinations and delusional ideation (especially paranoid delusions) are relatively common in individuals with [borderline personality disorder]. . . . Psychotic symptoms in BPD seem to be significantly related to the context (usually stressful events) and appear or intensify in response to situational crisis."   https://pubmed.ncbi.nlm.nih.gov/30169467/ (last visited Mar. 27, 2023).

Winkler was released to his grandparents' home with prescriptions for lithium, trazadone, and lurasidone. (Doc. 11-8, p. 222).[5]

At a therapy appointment on April 4, 2018, Mr. Winkler reported that he felt anxious, but he was not experiencing hallucinations or having suicidal thoughts. (Doc. 11-8, pp. 113-14). Mr. Winkler had not filled his prescriptions, but he was taking lithium. (Doc. 11-8, p. 114). A social worker spoke with Mr. Winkler about coping skills for his anxiety and asked Mr. Winkler to follow up with his PMA and his individual therapist. (Doc. 11-8, p. 113).

On April 6, 2018, the therapist who treated Mr. Winkler, Jack Williams, requested a physician consult. (Doc. 11-8, p. 19). Mr. Winkler reported that he was not depressed, but he was having visual hallucinations. Mr. Winkler stated that the hallucinations were better than before, but he reported seeing streamers on the floor and bulging walls and windows. He also reported tremors and restlessness but no anxious thoughts. (Doc. 11-8, pp. 19-20). Mr. Winkler stated that he could not afford his prescription for Latuda, and Mr. Williams reported that Mr. Winkler had some confusion about his lithium prescription. (Doc. 11-8, pp. 19-20). Dr. Khusro, the consulting physician, noted that Mr. Winkler could come in to get samples and

---

[5] Lurasidone, also known by its brand name Latuda, is used to treat depression in adults with bipolar disorder. This medication is used along with lithium and works by changing the activity of certain neural substances in the brain. https://medlineplus.gov/druginfo/meds/a611016.html (last visited on March 8, 2023).

advised that if Mr. Winkler was not well, then he needed to go to the ER.  (Doc. 11-8, p. 19).

On June 15, 2018, Mr. Winkler arrived by ambulance to the Gadsden Regional ER and was admitted to the psychiatric unit.  (Doc. 11-8, p. 231).  Mr. Winkler was going through a divorce, his depression was getting worse, and he was having frequent suicidal thoughts.  (Doc. 11-8, pp. 231, 239).  Mr. Winkler reported frequent panic attacks and difficulty sleeping.  He reported that he had not taken his Latuda for three months because it made him feel easily frustrated.  (Doc. 11-8, p. 239).  Mr. Winkler had not taken lithium for several days and had not gone to his appointments at CED.  (Doc. 11-8, p. 239).  While in the hospital, Mr. Winkler restarted lithium and began a regimen of Risperidone to target his mood, insomnia, and depressive symptoms.  (Doc. 11-8, p. 243).[6]  He was discharged on June 20, 2018 with prescriptions for lithium, risperidone, and trazadone.  (Doc. 11-8, p. 228).  At discharge, Mr. Winkler was very concerned about the cost of medications and hospitalization.  (Doc. 11-8, p. 239).

The following day, Mr. Winkler had a therapy session.  (Doc. 11-8, pp. 18).  He reported that he was feeling better and that he was able to fill his prescriptions.

---

[6] Risperidone, also known by its brand name Risperdal, is in a class of medications called atypical antipsychotics and works by changing the activity of certain natural substances in the brain. https://medlineplus.gov/druginfo/meds/a694015.html (last visited on March 8, 2022).

(Doc. 11-8, pp. 18).  Mr. Winkler was in an upbeat and happy mood, and he was oriented to person, place, time, and situation.   (Doc. 11-8, pp. 18, 111).

Mr. Winkler sought treatment at the Gadsden Regional ER on July 11, 2018. (Doc. 11-9, p. 2).  Mr. Winkler arrived by ambulance from work.  (Doc. 11-9, p. 5). Mr. Winkler reported that he "want[ed] to gather a bunch of people so that they [could] watch [him] either shoot [him]self or watch [him] jump off a bridge," and he wanted to get to the hospital "before he killed himself."  (Doc. 11-9, p. 5).  Dr. Michael Anderson admitted Mr. Winkler to the inpatient psychiatric unit to monitor him because of his significant depressed mood and suicidal ideations.  (Doc. 11-9, p. 13).  Mr. Winkler reported that he was compliant with his medications, but he expressed a need for them to be effective.   Mr. Winkler stated that he was stressed with work and over-worked.  (Doc. 11-9, p. 13).  Dr. Anderson noted that Mr. Winkler did not appear to be psychotic.  (Doc. 11-9, p. 13).  While admitted, Mr. Winkler took lithium and Risperdal to target his mood and depressive symptoms, and he attended group activities, interacted well with staff and peers, and denied thoughts of self-harm. (Doc. 11-9, p. 13).  On July 15, 2018, when Mr. Winkler was stabilized, Dr. Anderson discharged him.  (Doc. 11-9, p. 13).

Mr. Winkler had a therapy appointment on July 17, 2018. (Doc. 11-8, p. 16). Mr. Winkler reported that he felt better.  Mr. Winkler believed that his medications were working, and he reported no suicidal ideations.  (Doc. 11-8, p. 16).  Mr.

Winkler reported that he had lost his job because of his recent hospitalization.  (Doc. 11-8, p. 16).  The therapist encouraged Mr. Winkler to use positive coping skills when he felt suicidal and to go to the hospital if he felt overwhelmed.  (Doc. 11-8, pp. 16-17).

At Mr. Winkler's August 2, 2018 therapy appointment, he reported that his mood had been up and down, and he reported visual hallucinations.  (Doc. 11-8, p. 15).  Mr. Winkler was encouraged to consult with the psychiatrist during his next appointment.  (Doc. 11-8, p. 15).

On September 27, 2018, Mr. Winkler had an appointment at CED to update his treatment plan.  (Doc. 11-8, p. 107).  Mr. Winkler reported an increase in his depression and anxiety because of his divorce.  (Doc. 11-8, p. 107).  Mr. Winkler informed his therapist that he was not taking his medication as prescribed.  (Doc. 11-8, pp. 63, 107).  Mr. Winkler's therapist informed him that his increase in symptoms might be due to his noncompliance with his medication.  (Doc. 11-8, p. 107).

On October 26, 2018, Dr. Khurso evaluated Mr. Winkler.  (Doc. 11-8, p. 105).  Mr. Winkler was cooperative and engaged, and his speech was normal.  His thought processes were goal directed, and his thought content did not include suicidal or homicidal ideations, paranoia, or delusions.  (Doc. 11-8, p. 105).  Dr. Khurso indicated that Mr. Winkler's attention, concentration, and insight were okay.  Dr.

Khurso noted that Mr. Winkler was seeing things out of the corner of his eye, but he felt that Mr. Winkler's hallucinations were not true hallucinations.  Dr. Khurso noted Mr. Winkler's hospitalizations in March, June, and July and reported that Mr. Winkler did not attend appointments in July and August.  Mr. Winkler reported to Dr. Khurso that he was out of medications because he had missed his appointments, and he asked Dr. Khurso to adjust his medication to address his increased anxiety. (Doc. 11-8, pp. 105-06).  Dr. Khurso added Buspar to treat Mr. Winkler's anxiety and checked Mr. Winkler's lab results.  (Doc. 11-8, p. 105).[7]  Dr. Khurso noted that Mr. Winkler had recently started a job at the Attala Wal-Mart and that Mr. Winkler did not have health insurance.   (Doc. 11-8, p. 105).

Disability Determination Services referred Mr. Winkler for a mental examination with Dr. Jack Bentley on November 2, 2018.  (Doc. 11-8, p. 65).  Dr. Bentley noted that Mr. Winkler had a two-to-three-year history of depression and anxiety which Mr. Winkler attributed to his chaotic marriage.  (Doc. 11-8, p. 65). Mr. Winkler reported frequent suicidal and homicidal thoughts.  Based on his review of the medical records that were provided to him, Dr. Bentley found no evidence of hallucinations or paranoia.  (Doc. 11-8, pp. 65, 67).

Dr. Bentley noted that Mr. Winkler had received inpatient treatment at GRMC on six or seven occasions, and Mr. Winkler received outpatient care at CED Mental

---

[7] https://medlineplus.gov/druginfo/meds/a688005.html (last visited March 28, 2023).

Health Center.  (Doc. 11-8, p. 65).  Dr. Bentley indicated that Mr. Winkler was being treated with "a variety of psychiatric medications, including major tranquilizers, in an effort to stabilize []his symptoms."  (Doc. 11-8, p. 65).  Dr. Bentley stated that Mr. Winkler had moderate to severe depression and showed signs of flashbacks, nightmares, guilt, intrusive thoughts, and a marked loss of coping skills.  (Doc. 11-8, p. 65).  Dr. Bentley opined that Mr. Winkler's psychiatric symptoms were a "product of [Mr. Winkler's] dysfunctional marriage," and Dr. Bentley believed that Mr. Winkler had begun "to regain some of his emotional stability."  (Doc. 11-8, p. 67).  Mr. Winkler had not been hospitalized in two months.  (Doc. 11-8, p. 65).

When he saw Dr. Bentley, Mr. Winkler had been working in the garden center at Walmart for one week.  He was scheduled to work 18 to 20 hours weekly.  Mr. Winkler reported that he had worked as a diesel mechanic, but he lost his job due to his mental health symptoms and hospitalizations.  (Doc. 11-8, p. 66).  Mr. Winkler showed evidence of a moderate sleep disturbance, but his sleep behavior improved with medications.  (Doc. 11-8, p. 66).   Mr. Winkler attended church on a regular basis, and he had started to reestablish some friendships.  Mr. Winkler enjoyed cooking, and he helped his mother with household tasks.  Mr. Winkler also reported that he was attempting to exercise to improve his health.  Mr. Winkler completed his activities of daily living without help.  (Doc. 11-8, p. 66).

Dr. Bentley diagnosed Mr. Winkler with bipolar disorder, depressed type (by history) and PTSD. (Doc. 11-8, p. 67). Dr. Bentley opined that Mr. Winkler "would have marked limitations in his ability to sustain complex or repetitive work-related activities [and] his impairment level for more simple tasks would fall in the mild to moderate range." Dr. Bentley noted no evidence of symptom exaggeration. (Doc. 11-8, p. 67). Dr. Bentley concluded that Mr. Winkler could communicate effectively with coworkers and supervisors, and he could sustain "simple, non-stressful work-related activities" if he was motivated. (Doc. 11-8, p. 67).

Less than two weeks after his visit with Dr. Bentley, Mr. Winkler returned to the Gadsden Regional ER by ambulance. (Doc. 11-9, p. 23). Mr. Winkler reported suicidal ideations; he planned to overdose at work on medications that he had in his possession, and he had made videos to tell his children goodbye. (Doc. 11-9, pp. 23, 34). Mr. Winkler was admitted to the inpatient psychiatric unit. (Doc. 11-9, p. 32). Mr. Winkler reported to Dr. Michael Anderson that his depression became worse after he received a past-due-child-support notice. (Doc. 11-9, p. 34). Mr. Winkler explained that he had run out of lithium because he missed appointments with his doctor. (Doc. 11-9, p. 34). Mr. Winkler told Dr. Anderson that he "felt like a different person on the Lithium" and that it "really helped." (Doc. 11-9, p. 34). Mr. Winkler reported that after seeing Dr. Bentley, he "now believe[d] that he ha[d] PTSD from his previous relationship with his ex-wife." (Doc. 11-9, p. 34).

18

On the day of his admission, Mr. Winkler was withdrawn, his mood was down, and his judgment and insight were limited. (Doc. 11-0, p. 36). Dr. Anderson increased Mr. Winkler's lithium and started him on Paxil, and Mr. Winkler's mood improved. (Doc. 11-9, p. 32). Shortly after his admission, Mr. Winkler began to deny suicidal ideations, and he displayed appropriate behaviors on the unit without psychotic symptoms. (Doc. 11-9, p. 32). Mr. Winkler was discharged to home in stable condition on November 18, 2018, four days after he was admitted. (Doc. 11-9, pp. 32-22).

Mr. Winkler attended a post-hospitalization appointment at CED on November 20, 2018. (Doc. 11-8, p. 104). He reported that he was triggered by his ex-wife and child support issues and that he had had suicidal thoughts and had developed a plan to kill himself. (Doc. 11-8, p. 104). Mr. Winkler denied suicidal ideations on the day of his appointment and stated that his medications were working well. (Doc. 11-8, p. 104).

Mr. Winkler received treatment at the Gadsden Regional ER on February 28, 2019 after an intentional overdose of unknown substances; he stated he took ninety-four pills. (Doc. 11-9, pp. 43, 51). Mr. Winkler was confused, indicated that he had been having daily thoughts of suicide, and had an empty 50mg Sertraline pill bottle.

(Doc. 11-9, pp. 43, 51).[8]  Mr. Winkler was admitted to the ICU.  (Doc. 11-9, p. 49).

He was lethargic and sleepy but could be aroused.  He had sinus tachycardia "likely

from meds taken."  (Doc. 11-9, p. 56).

Nurse Practitioner John Cheatwood performed a psychiatric consultation on

March 1, 2019 while Mr. Winkler was in the ICU.  (Doc. 11-9, p. 59).  Mr. Winkler

woke briefly and was either unable or unwilling to participate in an interview.  Nurse

Cheatwood informed Mr. Winkler that he would have to move to the psychiatry unit

for treatment and evaluation before discharge.  (Doc. 11-9, p. 59).

Mr. Winkler was admitted to a locked unit for safety and restarted on lithium

to address his depression and for mood stabilization and impulsivity.  (Doc. 11-9, p.

60).  Though Mr. Winkler had reported in the emergency room that he had taken 94

unknown pills at home, (Doc. 11-9, p. 43), he reported at some point during his stay

in the psychiatry unit that he had taken trazadone, Risperdal, Zoloft, and five lithium

capsules at work.  (Doc. 11-9, p. 60).  He posted a suicide note on Facebook.  (Doc.

11-9, p. 60).  He was depressed because he had been sued for unpaid child support.

(Doc. 11-9, p. 60).

---

[8] "Sertraline is used to treat depression, obsessive-compulsive disorder OCD), panic disorder, premenstrual dysphoric disorder (PMDD), posttraumatic stress disorder (PTSD), and social anxiety  disorder  (SAD)."      https://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940#:~:text=Sertraline%20is%20used%20to%20treat,social%20anxiety%20disorder%20(SAD). (last visited March 13, 2023).

As of March 4, 2019, Mr. Winkler was cooperative but withdrawn, his mood was depressed, and his impulse control was limited.  (Doc. 11-9, p. 63).  Mr. Winkler indicated that several relatives had bipolar disorder, and two relatives had taken their own lives.  (Doc. 11-9, p. 62).  Mr. Winkler reported that his medication regimen of trazodone, Risperdal, and Zoloft were ineffective and made him sleep excessively.  (Doc. 11-9, p. 64).  Mr. Winkler felt he did well on lithium, but he could not afford the bloodwork associated with the medication.  (Doc. 11-9, p. 64).  Mr. Winkler stated that he felt he needed to be committed somewhere because of the severity of his symptoms.  (Doc. 11-9, p. 62).  Dr. Meadors was concerned about malingering because Mr. Winkler was applying for disability.  (Doc. 11-9, p. 62).

In a March 7, 2019 discharge note, Dr. Meadors noted that Mr. Winkler "did not appear particularly depressed during his time on the psychiatric unit and there was some question as to the validity of his claims of overdose prior to admission as he seemed fairly stable from a medical standpoint upon arrival to the hospital."  (Doc. 11-9, p. 60).  Mr. Winkler was discharged with prescriptions for lithium, Zyprexa, and melatonin.  (Doc. 11-9, pp. 41-42).

Mr. Winkler had an appointment at CED on March 12, 2019.  (Doc.11-8, p. 70).  In recounting the events leading to his hospitalization, Mr. Winkler reported that while on break from his job at Academy Sports, he decided to take ninety-four pills.  Mr. Winkler reported that he was feeling severely depressed when he took the

pills, but he was not having thoughts to harm himself at the time of the CED visit. (Doc. 11-8, p. 70).  Mr. Winkler reported that all of his medications were changed during his hospitalization.  Mr. Winkler's mother was keeping his medication.  (Doc. 11-8, p. 69).  Mr. Winkler believed that his new medications were working well, but he felt like he was "rapid cycling." (Doc. 11-8, p. 70).[9]  Mr. Winkler explained that he felt depressed; then he felt manic; then he felt normal—with these constant phases happening several times during the day.  (Doc. 11-8, p. 70).  Mr. Winkler believed that he needed to be seen more than every three months because he was having a hard time dealing with stress and coping with his emotions.  Mr. Winkler believed that he needed to be in a hospital where he could get weekly help.  (Doc. 11-8, p. 70).  Mr. Winkler's mood was euthymic, his affect was appropriate, and he was oriented to person, place, time, and situation.  (Doc. 11-8, p. 69).

Mr. Winkler returned to CED on March 28, 2019 for a mental status exam with Certified Registered Nurse Practitioner Judith Morris.  (Doc. 11-8, p. 72).  Mr. Winkler reported that his mood swings were all over the place.   (Doc. 11-8, p. 72).  CRNP Morris indicated that Mr. Winkler's mood was euthymic, and his affect was incongruent with his reported mood.   His thought processes, orientation, and

---

[9] Rapid cycling is diagnosed when a person experiences four or more episodes of mania, hypomania, or depressive episodes in any 12-month period. https://www.dbsalliance.org/education/bipolar-disorder/rapid-cycling-bipolar/ (last visited on March 9, 2023).

memory were within normal limits, but his insight and judgment were limited. (Doc. 11-8, p. 72). CRNP Morris recounted the circumstances of Mr. Winkler's overdose, noting that before his hospitalization, he slept all the time because he was on Risperdal, trazodone, and Zoloft. Mr. Winkler explained that he would stop his medication for a week or two until it was out of his system; then he would restart it. (Doc. 11-8, p. 73). Mr. Winkler reported that he was rapid cycling—that he was happy and sad at the same time. Mr. Winkler reported that his medication was helpful, but he felt that something needed to be added because he was still having mood swings. (Doc. 11-8, p. 73).

Mr. Winkler's mother noted that he did not have insurance, so he needed prescriptions that did not require blood tests. Mr. Winkler acknowledged that he needed blood tests for lithium, and he agreed to begin a trial on Lamictal. (Doc. 11-8, pp. 73.[10] Mr. Winkler stated that he understood he needed to take the medications as prescribed. (Doc. 11-8, p. 76). CRNP Morris discontinued all medications prescribed before Mr. Winkler's hospitalization. (Doc. 11-8, p. 76).

Mr. Winkler returned to CED on April 25, 2019. (Doc. 11-8, p. 78). Mr. Winkler had appropriate speech and affect, his behavior was cooperative, and his

---

[10] Lamictal, also known by its generic name lamotrigine, can be used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder. Lamictal is in a class of medications called anticonvulsants and works by decreasing abnormal electrical activity in the brain. https://medlineplus.gov/druginfo/meds/a695007.html (last visited on March 17, 2023).

mood was euthymic.  Mr. Winkler reported hallucinations, but he did not appear to respond to the internal stimuli.  His though content, thought process, orientation, and memory were within normal limits.  (Doc. 11-8, p. 78).  He reported that he was still having mood swings with two to three days of "bad depression."  (Doc. 11-8, p. 79). Mr. Winkler explained that his highs were shorter and less intense.  Mr. Winkler denied suicidal thoughts, but he indicated that the thoughts returned when he was depressed.  Mr. Winkler reported that he was not sleeping well.  (Doc. 11-8, p. 79). Mr. Winkler also noticed that noises were much more irritating to him.  He denied side effects from his medications.  (Doc. 11-8, p. 79).  CRNP  Morris asked Mr. Winkler to continue his prescribed medications.  (Doc. 11-8, p. 81).

At a therapy session on August 16, 2019, Mr. Winkler reported that he had quit a recent job as a diesel mechanic because of the "high stress." (Doc. 11-8, p. 84).  Mr. Winkler reported that he continued to have auditory and visual hallucinations.  (Doc. 11-8, p. 84).  Mr. Winkler reported that he was not taking his antipsychotic medication as prescribed because the medications "cause[d] him to sleep for days at a time."  (Doc. 11-8, p. 84).  Mr. Winkler reported that the Lamictal gave him a rash, but he believed the lithium was working; however, he was unable afford the bloodwork.  (Doc. 11-8, p. 84).  Mr. Winkler rated his depression as 7/10. (Doc. 11-8, p. 84).  Mr. Winkler's therapist planned to increase his therapy sessions. (Doc. 11-8, p. 84).

Mr. Winkler attended a therapy appointment at CED on September 10, 2019. (Doc. 11-8, p. 87). Mr. Winkler reported "continued mood swings, anger outbursts, auditory and visual hallucinations, racing thoughts, and feelings that he was being touched. (Doc. 11-8, p. 87). Mr. Winkler explained that he constantly felt that he was at war with himself. Mr. Winkler was taking his lithium as directed, but he had discontinued Lamictal and Zyprexa because of their side effects. (Doc. 11-8, p. 87). Mr. Winkler told his therapist that he did not feel he could maintain employment due to his mental illness, and he stated, "[i]f I don't get approved for disability, then I don't know what I'm going to do." (Doc. 11-8, p. 87). Mr. Winkler reported that his parents kept telling him to get a job. The therapist advised him not to seek employment and asked him to continue therapy sessions monthly to explore positive ways to decrease anger and irritability. (Doc. 11-8, p. 87).

Mr. Winkler had a mental status exam with CRNP Morris on September 12, 2019. Mr. Winkler was relaxed and cooperative, his speech was appropriate, and his mood was dysphoric. (Doc. 11-8, p. 89). Nurse Morris wrote:

> client reports he often forgets to take his medications. He said when he forgets the Lithium he gets depressed and when he restarts it he feels much better and can actually feel the medication 'pulling me back up' but said he just can't remember it. Also, he can't afford the lab work required because he has no insurance. He said he can get a job but can't keep a job because of his mood swings. He said he had mostly been depressed, but is getting more angry. He spends most of his time by himself in their basement. He said he has been having A/V hallucinations and paranoia. He said he also stopped the Olanzapine

because he slept too much.  He stopped the Lamictal due to developing
a rash.

(Doc. 11-8, p. 91).  Nurse Morris prescribed Abilify and discontinued Mr. Winkler's

other medications.   (Doc. 11-8, p. 92).[11]   Mr. Winkler deferred having his labs

checked because he did not have insurance.  (Doc. 11-8, p. 92).

Mr. Winkler returned to CED for individual therapy on October 31, 2019.

(Doc. 11-8, p. 94).  Though prescribed Abilify, Mr. Winkler reported to the therapist

that his suicidal ideations had increased since taking Rexulti; therefore, he stopped

taking it.    (Doc. 11-8,  p.  95).[12]    Mr.  Winkler  reported  "continued  poor

concentration/lack of focus, depression, some sleep [], mood swings, consistent

auditory and visual hallucinations[,] and racing thoughts.  (Doc. 11-8, p. 95).  Mr.

Winkler attributed his stress to being sued for child support by his ex-wife. Mr.

Winkler was not working and could not afford child support.  Mr. Winkler was not

able to take lithium because of the cost of labs.  (Doc. 11-8, p. 95).

---

[11] Abilify, also known by its generic name aripiprazole, is used, along with other medications, to treat episodes of mania or mixed episodes for individuals with bipolar disorder. Abilify can also be used with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone. Abilify is in a class of medications called atypical antipsychotics and works by changing the activity of certain natural substances in the brain. https://medlineplus.gov/druginfo/meds/a603012.html (last visited on March 8, 2023).

[12] Rexulti, also known by its generic name brexpiprazole, is used with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone. Rexulti is in a class of medications called atypical antipsychotics and works by changing the activity of certain natural substances in the brain.  https://medlineplus.gov/druginfo/meds/a615046.html (last visited on March 8, 2023).  The Court has not found in the administrative record a prescription for Mr. Winkler for Rexulti, but Mr. Winkler reported his use of the drug more than once in 2019.

*Mr. Winkler's Administrative Hearing*

Mr. Winkler's administrative hearing took place on December 4, 2019.  (Doc. 11-3, p. 16).  Mr. Winkler was 27, and he lived with his mother and father.  Mr. Winkler testified that he and his wife were divorced, and they had two small children.  (Doc. 11-3, pp. 37-41).  Mr. Winkler believed that he could not work a full-time job because his suicidal thoughts prevented him from working.  (Doc. 11-3, p. 40).  He was taking Rexulti.  (Doc. 11-3, p. 41).

Mr. Winkler had worked for Sports Academy, Wal-Mart, Way to Go Merchandise, Valley Services, Kirk National Lease, and Dirt Cheap.  (Doc. 11-3, pp. 37-40, 43-45).  Mr. Winkler testified that he quit or was fired from each job because of his suicidal ideations and anger issues.  (Doc. 11-3, 37-40, 43-45).  Mr. Winkler testified that he took ninety-four pills while working at Sports Academy.  (Doc. 11-3, p. 37).  Mr. Winkler testified that he lost his job at Wal-Mart because he had an "extreme rage" outburst with his manager when he was accused of wrongdoing.  (Doc. 11-3, p. 38).  Mr. Winkler testified that he quit his job at Way to Go Merchandise because he decided the job was not for him because he just could not take the suicidal thoughts anymore.  (Doc. 11-3, p. 39).  Valley Services closed down and moved to an inconvenient location, but he testified that he had suicidal thoughts and was admitted to the hospital while employed there.  (Doc. 11-3, p. 39).  Mr. Winkler testified that, while working as a diesel mechanic for Kirk National

Lease, he went to the hospital two or three times.  He testified that he was fired because he did not call into work and let them know he was in the hospital.  (Doc. 11-3, p. 43).  At the time of the hearing, Mr. Winkler was working a seasonal position at Dirt Cheap, but he felt that the job was becoming too stressful.  (Doc. 11-3, pp. 44-45).

When asked to describe what he had to battle from an emotional standpoint at work, Mr. Winkler testified that he had high anxiety, like he was "constantly freaking out inside."  He stated that he felt like "there is a small fire burning inside . . . but mostly, [] suicidal thoughts, a little bit of homicidal thoughts, [and] depression."  (Doc. 11-3, p. 48).  Mr. Winkler testified that he tried to fight the feelings, but he did not know how to control them.  (Doc. 11-3, p. 48).  Mr. Winkler stated that he had physically harmed his wife before out of rage and that DHR required supervised visitations with his children.  (Doc. 11-3, pp. 49-50).  Mr. Winkler testified that he had extensive treatment at CED where he saw a psychiatrist every 90 days and a counselor every 30 days.  (Doc. 11-3, pp. 50-51).  Mr. Winkler testified that he was treated with medication, but the medication made him drowsy.  Mr. Winkler explained that he generally took two two-hour naps daily.  (Doc. 11-3, pp. 51-52).  Mr. Winkler testified that it was difficult for him to be around other people because of his anxiety and paranoia.  (Doc. 11-3, p. 51).  Lastly, Mr. Winkler testified that he had visual and auditory hallucinations, even while working.  He

stated that he heard and had conversations with two people that were not there, and he saw things in his peripheral vision.  (Doc. 11-3, pp. 52-54).

When questioned about his noncompliance with medication, Mr. Winkler testified that he failed to take his medication as prescribed because there were a few times that he "just ran out."  (Doc. 11-3, p. 43).  He explained that lithium helped his symptoms, but he could not afford the blood tests that were necessary to continue taking the medication.  (Doc. 11-3, p. 46).

Dr. Jewel Euto, a vocational expert, testified that Mr. Winkler's past work as a tire changer was semi-skilled and required heavy exertion; his jobs as a diesel mechanic were highly skilled jobs and required heavy exertion.  (Doc. 11-3, p. 60). The ALJ asked the VE to assume that there was a hypothetical individual with the same age, education, and past work experience who would be capable of work at all exertional levels with the following nonexertional limitations:

> This individual would be able to understand, remember, and carry out simple instructions and tasks for two-hour blocks of time.  This individual could tolerate changes in the workplace that are infrequent, and gradually introduced.  This hypothetical individual could have occasional work-related interaction with supervisors, coworkers, and the general public.

(Doc. 11-3, p. 60-61).  Dr. Euto concluded that with those limitations, Mr. Winkler's past work would be eliminated, but jobs existed within the national economy for an individual of Mr. Winkler's ability, age, education, work experience, and RFC such as a hand packager, warehouse worker, and laundry checker.  (Doc. 11-3, p. 61).  Dr.

Euto testified that if the individual would only occasionally be able to conform to a normal work schedule because he would either call off work, leave work early, or take excessive breaks during the workday, it would preclude all work due to excessively being off task.  (Doc. 11-3, p. 62).

## THE ALJ'S DECISION

The ALJ found that Mr. Winkler had not engaged in substantial gainful activity since June 12, 2018, the alleged onset date.  (Doc. 11-3, p. 18).  The ALJ determined that Mr. Winkler suffered from the severe impairment of bipolar disorder.  (Doc. 11-3, p. 19 (citing 20 CFR 404.1520(c))).  She also determined that Mr. Winkler suffered from the non-severe impairment of obesity.  (Doc. 11-3, p. 19).  Mr. Winkler felt that he was impaired by post-traumatic stress disorder, but the ALJ found that this impairment was not supported by medical signs and laboratory findings and therefore the impairment was medically indeterminable.  (Doc. 11-3, p. 19).  Based on a review of the medical evidence, the ALJ concluded that Mr. Winkler did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P Appendix 1.  (Doc. 11-3, p. 19).

Given these impairments, the ALJ evaluated Mr. Winkler's residual functional capacity.  The ALJ determined that Mr. Winkler had the RFC to perform:

a full range of work at all exertional levels but with the following nonexertional limitations: He would be able to understand, remember, and carry out simple instructions and tasks for two-hour blocks of time. He could tolerate changes in the workplace that are infrequent and gradually introduced. He could have occasional work-related interaction with supervisors, co-workers, and the general public.

(Doc. 11-3, pp. 21).

Based on this RFC, the ALJ concluded that Mr. Winkler could not perform his past relevant work as a tire changer and as a diesel mechanic as actually or generally performed. (Doc. 11-3, pp. 25-26). Relying on testimony from the vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Mr. Winkler could perform, including hand packager, warehouse worker, and laundry checker. (Doc. 11-3, pp. 26-27). Accordingly, the ALJ determined that, following Mr. Winkler's June 12, 2018 alleged onset date, he was not under a disability as defined by the Social Security Act. (Doc. 11-3, p. 27).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and her 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a

scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  If the court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

For several reasons, the Court remands this matter for further proceedings. First, the ALJ did not properly consider the episodic nature of Mr. Winkler's severe impairment of bipolar disorder and his history of frequent, multi-day

hospitalizations.  During the administrative hearing, the ALJ asked the vocational expert, Dr. Euto, what effect occasional noncompliance with a normal work schedule would have on the hypothetical individual's ability to work.  (Doc. 11-3, p. 62).  Dr. Euto testified that all work would be precluded "due to excessively being off task." (Doc. 11-3, p. 62; Doc. 15, p. 13).

In *Samuels v. Acting Comm'r of Soc. Sec.*, 959 F.3d 1042 (11th Cir. 2020), the Eleventh Circuit explained that an ALJ must "consider the episodic nature of bipolar disorder" and must account for the episodic nature of the impairment in determining an RFC and considering whether jobs exist in the national economy that the claimant can perform.  *Samuels*, 959 F.3d at 1046-47.  In *Samuels*, the Eleventh Circuit found that the ALJ failed to account for the claimant's difficulties completing a normal workweek and the fact that the claimant's symptoms could result in unexcused absences or time spent off-task.  *Samuels*, 959 F.3d at 1047.  The Eleventh Circuit added that the ALJ's inclusion in the claimant's RFC of restrictions to simple work and occasional public interactions were not sufficient to encompass the limitations that stemmed from the claimant's bipolar disorder.  *Samuels*, 935 F.3d at 1047.

Here, the ALJ did not properly assess Mr. Winkler's periods of absenteeism. When the ALJ discussed Mr. Winkler's hospitalizations, she minimized the significance of those hospitalizations, which typically lasted several days, by noting

that when Mr. Winkler was hospitalized, the symptoms of his bipolar disorder were exacerbated by noncompliance with his prescriptions and situational stressors.  For example, the ALJ recognized that Mr. Winkler was hospitalized for five days in June of 2018, but she added that Mr. Winkler "was going through relationship problems," and he "had not taken his Lithium for several days."  (Doc. 11-3, p. 22).  The ALJ found that this evidence was "indicative of non-compliance with treatment leading to exacerbation of symptoms and situational stressors." (Doc. 11-3, p. 22).  The ALJ observed that, "[d]espite medication non-compliance, on November 2, 2018 when [Mr. Winkler] presented to Jack Bentley, Jr. Ph.D. for a consultative examination, it was noted that his psychiatric symptoms seemed to be improving gradually since being divorced and avoiding contact with his ex-wife, which further supports that his symptoms are situational and not continuous in nature []."  (Doc. 11-3, p. 23).

Throughout her decision, the ALJ discussed instances of treatment and noncompliance dating from February 2018 to October 2019.   (Doc. 11-3, pp. 22-24).  The ALJ concluded that Mr. Winkler's bipolar disorder "and related symptoms [were] well controlled with therapy and prescription medications when he [was] compliant, and that he has maintained the ability to remain socially active and independently completes activities of daily living with few limitations despite exacerbations of symptoms due to either situational stressors or medication noncompliance, which is indicative of his continued ability to adaptively function

and that these impairments do not cause debilitating functional limitations."  (Doc. 11-3, p. 24).

This analysis is legally and factually flawed.  Legally, the ALJ's attribution of Mr. Winkler's bipolar symptoms such as his suicidal ideations to situational stressors at home and at work is analytically unsound because the assessment is at odds with Mr. Winkler's treatment records, and an ALJ may not substitute her judgment for the judgment of medical and vocational experts.  *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982); *see also Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (stating that an ALJ "may not arbitrarily substitute his own hunch or intuition for the diagnoses of a medical professional") (Johnson, J. concurring specially).   In October of 2017, while Mr. Winkler was hospitalized at Gadsden Regional's inpatient psychiatry unit, (Doc. 11-8, p. 162), he reported to Dr. Carr that his wife "push[ing] his buttons" made his bipolar "act up."  (Doc. 11-8, p. 166).  Dr. Carr explained to Mr. Winkler that "bipolar [is not] simply [a] reaction of agitation to someone's behavior," and that bipolar involved "distinct mood episode[s]."  (Doc. 11-8, p. 168).

The Court recognizes that in his report of his evaluation of Mr. Winkler, Dr. Bentley stated that Mr. Winkler's "psychiatric symptoms [were] apparently a product of [his] dysfunctional marriage," (Doc. 11-8, p. 67), but Dr. Bentley's assessment is vulnerable under 20 C.F.R. § 404.1520c.  That regulation identifies

several factors for determining the weight assigned to a medical opinion. "Those factors include the supportability of the medical opinion, its consistency with other record evidence, the physician's relationship with the claimant, the physician's specialty, and other relevant information, such as the physician's familiarity with the other record evidence and with making a claim for disability. *Harner v. Soc. Sec. Admin., Com.*, 38 F.4th 892, 897 (11th Cir. 2022) (citing § 404.1520c(c)(1)–(5)). Supportability and consistency are the most important factors. 20 C.F.R. § 404.1520c(b)(2).

As to supportability, in linking Mr. Winkler's symptoms to his marriage, Dr. Bentley seemed to merely repeat what Mr. Winkler told him. (Doc. 11-8, p. 65).[13] Dr. Bentley's finding is inconsistent with Dr. Carr's explanation that bipolar disorder is not situational. In addition, Dr. Bentley did not treat Mr. Winkler in a hospital setting. Dr. Bentley spent a short period of time with Mr. Winkler, and he seemed unfamiliar with Mr. Winkler's medical records because Dr. Bentley stated that in the records he reviewed, there was no evidence of hallucinations or paranoia. (Doc. 11-8, pp. 65, 67). The medical records before the Court contain multiple reports of audio and visual hallucinations. (Doc. 11-8, pp. 10, 15, 19-20, 78, 84, 87, 91, 95,

---

[13] The same is true with respect to Dr. Bentley's finding that Mr. Winkler suffers from PTSD. (Doc. 11-8, p. 67). As the ALJ found, there is no medical evidence to support that diagnosis. (Doc. 11-3, p. 19).

105, 115, 187, 225-26).   On remand, the ALJ should determine whether she can properly rely on Dr. Bentley's opinion.

As to Mr. Winkler's noncompliance with his medication, the ALJ believed that Mr. Winkler would have fewer hospitalizations if he followed his prescriptions more carefully.   The record shows that Mr. Winkler was hospitalized several times with suicidal ideations even though he was taking his medication as directed. Moreover, Mr. Winkler explained to his doctors that he took breaks from his medications for one to two weeks because the medication made him sleep excessively.   (Doc. 11-8, pp. 73, 84, 91; Doc. 11-9, p. 64).   The ALJ did not consider the side effects of Mr. Winkler's medication in assessing his ability to maintain a normal work schedule.   SSR 96-8p requires that an RFC assessment "be based on *all* of the relevant evidence in the case record, such as: . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, [and] side effects of medication). . . ."   SSR 96-8P, 1996 WL 374184, at *5 (emphasis in original); *see also J.P. v. Comm'r of Soc. Sec. Admin.*, No. 120CV12LAGTQL, 2021 WL 18941446, at *2 (M.D. Ga. Mar. 19, 2021) ("Absenteeism . . . resulting from a plaintiff's need for treatment may constitute evidence that a claimant is unable to perform work activity on a regular and continuing basis or on an equivalent schedule.").

In total, per Mr. Winkler's medical records, he was hospitalized 44 days during the relevant time period. (Doc. 11-8, pp. 6, 148, 166, 187, 223, 239; Doc. 11-9, pp. 13, 32, 60). In the 12 months following his alleged onset date, Mr. Winkler was hospitalized for 20 days. (Doc. 11-8, p. 239; Doc. 11-9, pp. 13, 32, 60). Work on a "'regular and continuous basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). On remand, the ALJ should consider whether substantial evidence supports her conclusion that Mr. Winkler can avoid hospitalizations by avoiding stressors and complying with his medication.[14]  The ALJ also should consider Mr. Winkler's complete medical history and the VE's opinion that if Mr. Winkler was limited in his ability to conform to a normal work schedule, all work would be precluded. (Doc. 11-3, p. 62).

Separately, the ALJ's analysis of Mr. Winkler's ability to get along with co-workers despite his bipolar disorder is not supported by substantial evidence. The ALJ relied upon evidence that Mr. Winkler was pleasant when he interacted with medical providers, and the ALJ stated that Mr. Winkler got along well with family members. (Doc. 11-3, pp. 20-21). But the ALJ did not account for the fact that a work environment is significantly different from a counseling appointment or a

---

[14] The ALJ should consider whether Mr. Winkler realistically can avoid stressors when his reported triggers are his ex-wife, his parents, and his child support obligations.

home environment. *Mace v. Comm'r, Soc. Sec. Admin.*, 605 Fed. Appx. 837, 842 (11th Cir. 2015) (citing 20 C.F.R. § 404, Subpt. P., App. 1, § 12.00(C)(E)) ("We must exercise great care in reaching conclusions about [a claimant's] ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on [a claimant's] ability to complete tasks in other settings that are less demanding, highly structured, or more supportive.") (alteration in *Mace*). The ALJ also did not account for the evidence that demonstrates that Mr. Winkler did not get along well with his parents and that he was fired from one job because he had an "extreme rage" outburst with his manager when he was accused of wrongdoing. (Doc. 11-8, pp. 87, 115, 120; Doc. 11-3, p. 38). The ALJ did not account for Dr. Meadors's March 2018 finding that Mr. Winkler's "history of interpersonal conflict" and his hallucinations might indicate "micropsychotic episodes and reflective of personality disorder." (Doc. 11-8, p. 226). An ALJ may not emphasize evidence that supports a particular conclusion and overlook evidence that is inconsistent with the conclusion. *Storey v. Berryhill*, 776 Fed. Appx. 628, 637 (11th Cir. 2019) ("The ALJ's selective inclusion of only 'normal' or negative examination results to support the ALJ's 'mild' characterization of [the claimant's] condition was not based on substantial evidence."); *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (finding that

39

the ALJ improperly "focus[ed] upon one aspect of the evidence and ignore[ed] other parts of the record. In such circumstances we cannot properly find that the administrative decision is supported by substantial evidence. It is not enough to discover a piece of evidence which supports that decision, but to disregard other contrary evidence. The review must take into account and evaluate the record as a whole.").[15]

## CONCLUSION

For the reasons discussed above, the Court remands this matter to the Commissioner for further consideration consistent with this opinion.

**DONE** and **ORDERED** this March 31, 2023.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[15] This concern extends to the ALJ's reliance on the job Mr. Winkler held at the time of his administrative hearing. In her opinion, the ALJ pointed out several times that Mr. Winkler was working at a seasonal job at the time of the hearing. (Doc. 11-3, p. 20). But Mr. Winkler had held that job for two weeks, and he found the job very stressful. (Doc. 11-3, pp. 44-45). Mr. Winkler had been terminated from or left six jobs between his onset date and the date of his hearing.